USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___4/25/18___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3M COMPANY,

            Plaintiff,

    – against –

HSBC BANK USA, N.A.,

            Defendant.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 5984 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff 3M Company ("3M") seeks an injunction prohibiting Defendant HSBC Bank USA, N.A. ("HSBC") from making payment on a letter of credit (the "Amended HSBC Letter of Credit") issued in favor of Turkiye Cumhuriyeti Ziraat Bankasi ("Ziraat Bank"). (Cmplt. (Dkt. No. 1)) 3M obtained the Amended HSBC Letter of Credit to guarantee its performance as a subcontractor on a government project in Turkey. (Id. ¶ 2) Ziraat Bank has attempted to draw on the Amended HSBC Letter of Credit. (Id. ¶ 4; Arber Decl. (Dkt. No. 8) ¶¶ 5-6) 3M claims that the attempted draw on the Amended HSBC Letter of Credit is fraudulent and that it is entitled to injunctive relief, because payment on the Amended HSBC Letter of Credit would facilitate the alleged fraud and cause irreparable harm to 3M.[1] (Id. ¶¶ 4, 54)

---

[1] Although neither the Complaint nor the briefing submitted in connection with 3M's motion identifies the cause of action on which 3M is proceeding, Section 5-109 of the New York Uniform Commercial Code authorizes an action to enjoin payment on a letter of credit. Under N.Y. U.C.C. § 5-109, "if an applicant [for a letter of credit] believes that there has been fraud in the underlying transaction, or that a required document is forged or materially fraudulent, the applicant can apply to 'a court of competent jurisdiction' to 'enjoin the issuer from honoring a presentation.'" Great Wall De Venezuela C.A. v. Interaudi Bank, 117 F. Supp. 3d 474, 486 (S.D.N.Y. 2015) (quoting N.Y. U.C.C. § 5-109(b))); see also Louis Berger Grp., Inc. v. State Bank of India, 802 F. Supp. 2d 482, 487 (S.D.N.Y. 2011) (finding that proposed intervenor "is

3M has moved for a preliminary injunction to prohibit HSBC from making payment on the Amended HSBC Letter of Credit. (Dkt. No. 3) For the reasons stated below, 3M's motion will be denied.

## BACKGROUND

## I. FACTS

### A. 3M's Involvement as Subcontractor in Turkey

3M is a technology company that develops, manufactures, and sells electronics. (Cmplt. (Dkt. No. 1) ¶ 11) In 2012, 3M began working in a subcontracting role on a project for Posta Telgraf Teskilati Genel Mudurlugu ("PTT") (Driessen Decl. (Dkt. No. 29-6) ¶ 2; Driessen Decl., Ex. 2 (Dkt. No. 29-6) at 53-54), which is a subdivision of the Turkish government. (Reply Kaufman Decl. (Dkt. No. 24) ¶ 3(a); Reply Kaufman Decl., Ex. B (History of PTT) (Dkt. No. 24-2)) The project was for the development of the Electronic Toll Collection System (referred to as the "HGS Project"). (Reply Kaufman Decl. (Dkt. No. 24) ¶ 3(a))

PTT's prime contractor on the HGS project was Vendeka Bilgi Teknolojileri Ticaret Ltd. ("Vendeka"), a private Turkish company. (Cmplt. (Dkt. No. 1) ¶ 2) PTT contracted with Vendeka for the provision and installation of certain components to be used in the HGS Project. (See Driessen Decl. (Dkt. No. 29-6) ¶¶ 2-3; Driessen Decl., Ex. 1, App. C (Draft

entitled under New York Uniform Commercial Code § 5-109 to seek to enjoin an issuer from honoring an LOC if encashment would facilitate a material fraud"); In re Wisconsin Barge Line, Inc., 63 B.R. 40, 42-43 (Bankr. E.D. Mo. 1986) ("[A]n action to enjoin payment under a letter of credit is one founded solely on state law, specifically, Section [5-109] of the Uniform Commercial Code."). The applicant need not plead any additional causes of action for the injunction to issue. See Archer Daniels Midland Co. v. JP Morgan Chase Bank, N.A., No. 11 Civ. 988 (JSR), 2011 WL 855936, at *6 (S.D.N.Y. Mar. 8, 2011) (granting preliminary injunction where complaint alleged only a claim for injunctive relief under N.Y. U.C.C. § 5-109); Archer Daniels Midland Co., No. 11 Civ. 988 (JSR) (S.D.N.Y. Feb. 14, 2011) (Cmplt., Dkt. No. 1).

Agreement between Vendeka and PTT) (Dkt. No. 29-6) at 21-42)[2] Vendeka, in turn,

subcontracted part of the work to Federal Signal Technologies Group ("Federal"). (Driessen

Decl. (Dkt. No. 29-6) ¶ 2) In a May 23, 2011 agreement with Vendeka (the "Service

Agreement"), Federal agreed to provide certain computer hardware and software to be used in

the HGS Project. (Id.; see also Driessen Decl., Ex. 1 (Service Agreement) (Dkt. No. 29-6) at 6-

9)

On June 20, 2012, 3M entered into an asset purchase agreement with Federal.

(See Driessen Decl., Ex. 2 (July 9, 2012 Federal Ltr. to Vendeka) (Dkt. No. 29-6) at 53) As part

of the transaction, Federal assigned the Service Agreement to 3M. (Id.) Federal notified

Vendeka of the proposed assignment on July 9, 2012, and Vendeka subsequently agreed to the

assignment.[3] (Id. at 53-54) 3M worked with Vendeka on the HGS Project from June 2012 until

October 2015, when PTT removed Vendeka as primary contractor and replaced it with Tetra

HGS Elektronic Sistemleri A.S. ("Tetra"). (Driessen Decl. (Dkt. No. 29-6) ¶ 3; Driessen Decl.,

Ex. 3 (Transfer of Contract) at 57-61; Kaufman Decl. (Dkt. No. 29) ¶ 6) 3M then continued to

work with Tetra in a subcontracting role. (Kaufman Decl. (Dkt. No. 29) ¶ 6)

---

[2] The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Filing System.

[3] In a July 9, 2012 letter, 3M notified Vendeka of the proposed assignment and requested that
Vendeka "sign and return" the letter. (See Driessen Decl., Ex. 2 (July 9, 2012 Federal Ltr. to
Vendeka) (Dkt. No. 29-6) at 53-54) In connection with the pending motion, 3M has submitted a
copy of the July 9, 2012 letter bearing the signature of Ismail Meral, Vendeka's chief executive
officer. (Id.; Kardicali Decl. (Dkt. No. 25) ¶ 2) The signature is not dated. (Driessen Decl., Ex.
2 (July 9, 2012 Federal Ltr. to Vendeka) (Dkt. No. 29-6) at 54)

3

## B.    HSBC Letter of Credit

### 1.    3M's Application for a Letter of Credit

Under the Service Agreement that 3M assumed as a result of its acquisition of

Federal, 3M was obligated to post a letter of credit in favor of Vendeka as a performance

guarantee for its work on the HGS Project.  (Id. ¶ 5)  Under the terms of its agreement with PTT,

Vendeka was likewise obligated to post a performance guarantee in favor of PTT.  (Driessen

Decl., Ex. 1, App. C (Draft Agreement between Vendeka and PTT) (Dkt. No. 29-6) at 25)

Section 4.2 of the Service Agreement provides:

> [Federal] will provide a performance guarantee to VENDEKA in the form of a
> letter of credit.  The value of the letter of credit will be $1,000,000 (one million)
> USD.  The letter of credit must be accepted by the banks in Turkey and valid
> through the warranty as outlined in [other provisions of the agreement].

(Driessen Decl., Ex. 1 (Service Agreement) (Dkt. No. 29-6) at 7)

The conditions for Vendeka to draw on the letter of credit are as follows:

> Subject to Article 4.11, VENDEKA is entitled to payment pursuant to the letter of credit
> issued by [Federal] only under the following circumstances:
>
> i.    PTT declares in writing that VENDEKA is in default in an amount certain under
> any letter of credit, performance bond or other performance guarantee that
> VENDEKA has issued to PTT related to the HGS Project;
>
> ii.   Said default of VENDEKA is due to an event as occurring under either Article 34
> or 35 of Appendix C hereto (Agreement between VENDEKA and PTT); and,
>
> iii.  Said event of default of VENDEKA occurring under Article 34 or 35 of Appendix
> C hereto (Agreement between VENDEKA and PTT) is in turn caused by
> [Federal's] failure to perform one or more of its obligations as set forth in this
> Agreement.
>
> iv.   The LOC shall reference 4.2 above.

(Id.)[4]

---

[4] Articles 34 and 35 of the Vendeka-PTT agreement address a breach of the agreement by
Vendeka and the consequences of such a breach.  (Driessen Decl., Ex. 1, App. C (Draft
Agreement between Vendeka and PTT) (Dkt. No. 29-6) at 44-46)

4

On August 29, 2012, 3M submitted an application to HSBC for a $1 million standby letter of credit "on account of Aktif Yatirim Bankasi A.S. as advising bank for [Vendeka] and in favor of [PTT]." (Supp. Arber Decl. (Dkt. No. 46) ¶ 3; Supp. Arber Decl., Ex. A (3M Letter of Credit Application) (Dkt. No. 46-1) at 2) 3M's application explains that the letter of credit will serve as a guarantee for Vendeka's performance under its contract with PTT (Supp. Arber Decl., Ex. A (3M Letter of Credit Application) (Dkt. No. 46-1) at 3), and requests that the letter of credit include as a condition for drawing on the letter of credit that "[s]uch demand . . . be supported by [a] written statement certifying that [the party demanding payment has] received a demand for payment . . . in accordance with [the] terms [of the letter of credit] and that such demand is due to Federal Signal Technologies['] responsibilities under Section 4.2 of the Service Agreement dated 23 June 2011." (Id. at 3)

3M's application further requests that another Turkish bank – Ziraat Bank, Vakifbank, or T. Halk Bankasi – serve as the counterparty for the HSBC Letter of Credit to be issued in favor of Aktif Yatirim Bankasi ("Aktif Bank"). (Id. at 4) In other words, there would be a three-bank structure. The HSBC Letter of Credit would run in favor of one of the three Turkish banks listed above, and that bank would issue a letter of credit in favor of Aktif Bank. (Id. at 2, 4; see also Supp. Arber Decl. (Dkt. No. 46) ¶ 3)[5]

From the list of three Turkish banks listed in 3M's application, HSBC selected Ziraat Bank – an instrumentality of the Turkish government – as a counterparty to issue a counter standby letter of credit to Aktif. (Arber Decl. (Dkt. No. 8) ¶ 3; Kaufman Reply Decl. (Dkt. No.

---

[5] 3M represented to HSBC that the involvement of Aktif Bank was at the request of PTT. (Supp. Arber Decl., Ex. F (Oct. 25, 2012 HSBC email) (Dkt. No. 46-6) at 2)

24) ¶ 3(j); see also Supp. Arber Decl., Ex. B (Aug. 30, 2012 HSBC email) (Dkt. No. 46-2); Supp. Arber Decl., Ex. C (Sept. 10, 2012 Aktif email) (Dkt. No. 46-3))

Before finalizing the HSBC Letter of Credit, however, HSBC sought clarification from 3M as to the roles that the Turkish banks would play in the transaction:

Please clarify the following on your Standby request to Turkey (USD1,000,000.00)

What is the role of [Ziraat] Bankasi and, Aktif Bankasi

1) HSBC Bank USA is issuing their Standby LC in favor of [Ziraat] Bankasi to issue their local guarantee to Aktif Yatirim Bankasi who will issue their local guarantee to [PTT]

or

2) [Ziraat] Bankasi is just merely an advising bank.

or

3) Aktif Bankasi is the advising bank (as mentioned [in] the application) or the local issuer?

Please advise to revise the format.

(Supp. Arber Decl., Ex. F (Oct. 25, 2012 HSBC email) (Dkt. No. 46-6) at 2)

3M responded that "the beneficiary [– PTT –] wanted to use Aktif Bankasi so it should be option 1." (Id.) As discussed below, HSBC used the three-bank structure in issuing its letter of credit to Ziraat Bank. (Supp. Arber Decl. (Dkt. No. 46) ¶ 9)

## 2. Issuance and Amendment of the HSBC Letter of Credit

On October 30, 2012, HSBC issued the standby letter of credit that 3M had requested. The HSBC Letter of Credit is in favor of Ziraat Bank in the amount of $1 million. (See Kaufman Decl., Ex. C (HSBC Letter of Credit) (Dkt. No. 29-3); Arber Decl. (Dkt. No. 8) ¶ 3) The HSBC Letter of Credit further provides that Ziraat Bank will issue a "guarantee" to Aktif

6

Bank in the amount of $1 million, and that Ziraat Bank will request that Aktif Bank "issue their local guarantee in favor of [PTT] for an amount of USD1,000,000.00 (USD One Million)[.]" (Kaufman Decl., Ex. C (HSBC Letter of Credit) (Dkt. No. 29-3) at 2)  The HSBC Letter of Credit recites that its purpose is to guarantee Vendeka's "delivery of the toll road equipment and systems specified in Section 4.2 of the draft [S]ervice [A]greement dated 23 June 2011." (Id.)

Under the terms of the HSBC Letter of Credit, Ziraat Bank could only draw upon the HSBC Letter of Credit if it made a demand

supported by [a] written statement certifying that [it had] received a demand for payment . . . in accordance with [the] terms [of the letter of credit it had issued to Aktif Bank] and that such demand is due to Federal Signal Technologies['] responsibilities under Section 4.2 of the Service Agreement. . . .

(Id. at 3)  The HSBC Letter of Credit specifies that it will be governed and construed in accordance with the International Standby Practices (1998), International Chamber of Commerce Publications No. 590 ("ISP98"). (Id.)  For matters not addressed by ISP98, the HSBC Letter of Credit provides that New York law will govern. (Id.)

On November 2, 2012 – three days after the HSBC Letter of Credit was issued – Ziraat Bank requested that the HSBC Letter of Credit be amended. (Supp. Kaufman Reply Decl., Ex. D (Amendment Request) (Dkt. No. 74-1); see also Supp. Kaufman Decl. (Dkt. No. 56) ¶ 5; Arber Decl. (Dkt. No. 8) ¶ 3))  Ziraat Bank informed HSBC that certain changes in the HSBC Letter of Credit were required before Aktif Bank would issue its local guarantee to PTT. (Supp. Kaufman Reply Decl., Ex. D (Amendment Request) (Dkt. No. 74-1) at 2)

Ziraat Bank requested that the existing drawing conditions in the HSBC Letter of Credit be replaced with a statement that Ziraat Bank would be entitled to payment

upon receipt by [HSBC of Ziraat Bank's] first written demand via authenticated SWIFT. Such demand shall be supported by [Ziraat Bank's] written statement certifying that [Ziraat Bank] ha[s] received a demand for payment under [the

7

letter of credit Ziraat Bank issued in favor of Aktif Bank] in accordance with [that letter of credit's] terms.

(Id. at 3) The revised drawing conditions requested by Ziraat Bank and Aktif Bank removed any reference to the conditions set forth in Section 4.2 of the Service Agreement. (Compare id. with Kaufman Decl., Ex. C (HSBC Letter of Credit) (Dkt. No. 29-3); see also Arber Decl. (Dkt. No. 8) ¶ 5; Supp. Kaufman Decl. (Dkt. No. 56) ¶ 5))

On November 5, 2012, 3M approved Ziraat Bank's proposed amendment to the HSBC Letter of Credit. (Arber Decl., Ex. C (3M Consent) (Dkt. No. 8-3) at 3) HSBC issued the Amended HSBC Letter of Credit that same day. (Arber Decl., Ex. B (Amendment to HSBC Letter of Credit) (Dkt. No. 8-2)) The Amended HSBC Letter of Credit provides that payment to Ziraat Bank would be due once HSBC received Ziraat Bank's "written demand via authenticated SWIFT," such demand being supported by a "written statement [from Ziraat Bank] certifying that [Ziraat Bank] ha[s] received a demand for payment under [the letter of credit Ziraat Bank issued in favor of Aktif Bank] in accordance with [that letter of credit's] terms." (Id. at 2) Accordingly, the Amended HSBC Letter of Credit was the operative letter of credit when HSBC received Ziraat Bank's demand for payment on July 18, 2016. (Id.)

## C. **Demand on the Amended HSBC Letter of Credit**

On July 18, 2016, PTT made a demand on the letter of credit posted by Aktif Bank as a performance guarantee for Vendeka.[6] (Kaufman Reply Decl. (Dkt. No. 24) ¶ 3(a)) The drawdown occurred on the day Aktif Bank's letter of credit in favor of PTT was due to expire. (Id.; Kaufman Reply Decl., Ex. A (Aug. 9, 2016 Vendeka memorandum to PTT) (Dkt. No. 24-1)) As of July 18, 2016, Vendeka had not performed work on the HGS Project for

---

[6] The record does not contain the letter of credit Aktif Bank issued to PTT, and the terms of that document have not otherwise been provided to the Court.

8

approximately nine months, having been replaced by Tetra as the primary contractor. (Kaufman Reply Decl. (Dkt. No. 24) ¶ 3(b); Driessen Decl. (Dkt. No. 29-6) ¶ 8) Moreover, Tetra had provided PTT with a substitute performance guarantee to replace the guarantee covering Vendeka. (Kaufman Reply Decl. (Dkt. No. 24) ¶ 3(c)) Vendeka sought the return of its performance guarantee in the months after it was removed as primary contractor. (Id. ¶ 3(e))

The parties here dispute the reason for the drawdown on the Aktif Bank letter of credit: as discussed below, 3M contends that PTT's demand for payment on the Aktif Bank letter of credit is fraudulent (see Pltf. Reply Br. (Dkt. No. 23) at 2-3), while HSBC contends that PTT had a legitimate basis for its demand. (Def. Supp. Opp. (Dkt. No. 45) at 7-11)[7]

According to 3M, Aktif Bank satisfied PTT's demand for payment on the Aktif Bank letter of credit (Kaufman Reply Decl. (Dkt. No. 24) ¶ 3(a), (g)), and PTT deposited the $1 million it obtained from Aktif Bank into an account it controls at Ziraat Bank. (Id. ¶ 3(l)) Thereafter, PTT instructed Ziraat Bank to transfer the $1 million to an account controlled by Vendeka. (Id. ¶ 3(h)) 3M alleges that once the money was transferred to Vendeka's account, it was "promptly seized by the creditors of Vendeka." (Id.; see also Kardicali Decl. (Dkt. No. 25) ¶ 3)

PTT's demand on the Aktif Bank letter of credit triggered demands on the two remaining standby letters of credit. Aktif Bank demanded payment on the letter of credit issued

---

[7] According to HSBC,

> [t]he documents that 3M Company has submitted . . . show, not that there was a fraud, but that PTT properly drew on the Aktif Bank performance bond because Vendeka had not performed its contractual obligation to supply a statement from Turkish Social Security disclaiming any lien on the subject property by the time the bond was to expire.

(Def. Supp. Opp. (Dkt. No. 45) at 7)

by Ziraat Bank, and Ziraat Bank in turn made a demand on the Amended HSBC Letter of Credit. (Kaufman Decl. (Dkt. No. 29) ¶ 3; Arber Decl. (Dkt. No. 8) ¶ 6) On July 18, 2016 – the same day PTT drew down on the Aktif Bank letter of credit – HSBC received a communication from Ziraat Bank requesting that its account at Bank of New York Mellon be credited in the full amount of the Amended HSBC Letter of Credit. (Arber Decl. (Dkt. No. 8) ¶ 6; Arber Decl., Ex. E (Demand for Payment) (Dkt. No. 8-5)) Ziraat Bank stated that it had "received a valid demand for payment for USD 1,000,000[] from [] Aktif Yatirim Bankasi under our stan[d]by letter of credit in accordance with its terms." (Arber Decl., Ex. E (Demand for Payment) (Dkt. No. 8-5) at 1)

HSBC contends that Ziraat Bank's demand constitutes a conforming draw on the Amended HSBC Letter of Credit issued in favor of Ziraat Bank and seeks to make payment to Ziraat Bank. (Arber Decl. (Dkt. No. 8) ¶¶ 7-8) 3M argues that HSBC should be enjoined from making payment due to fraud in the transaction. (Kaufman Reply Decl. (Dkt. No. 24) ¶ 4) According to 3M, Vendeka did not default in performing its contract with PTT; 3M did not default in performing its obligations under the Service Agreement; PTT has offered conflicting explanations as to why it drew down on the Aktif Bank letter of credit, and ultimately admitted that it was not entitled to do so; and Vendeka has admitted that it had no right to the $1 million that PTT had transferred to its account. (Id. ¶ 3(b), (d), (f), (g), (i)) 3M also alleges that Ziraat Bank is a direct participant in the alleged fraud, because – in addition to demanding payment on the Amended HSBC Letter of Credit – it has "refused to provide to HSBC the documentation for its letter of credit in favor of Aktif Bank or the documentation of Aktif Bank's demand for payment to Ziraat Bank, all of which ha[s] been requested by 3M from HSBC." (Id. ¶ 3(k))

10

## II. PROCEDURAL HISTORY

3M commenced this action on July 27, 2016 and moved for a temporary restraining order and an order to show cause for a preliminary injunction. (Dkt. Nos. 1, 3) After a hearing held on July 27, 2016, this Court issued a temporary restraining order enjoining HSBC from making any payment on the Amended HSBC Letter of Credit and scheduled a hearing on 3M's application for a preliminary injunction for August 18, 2016.[8] (Dkt. No. 3) On August 15, 2016, 3M moved to adjourn the hearing and requested an order permitting it to take discovery from certain non-parties, including Ziraat Bank. (Dkt. No. 10) This Court granted the adjournment request but denied the request for discovery. (Dkt. No. 11)

On September 8, 2016, this Court conducted a hearing on 3M's application for a preliminary injunction. After the proceeding, the temporary restraining order was extended pending additional briefing. (Dkt. No. 35) On September 9, 2016, 3M moved for expedited discovery from both HSBC and Ziraat Bank. (Dkt. No. 34) This Court denied 3M's request as to Ziraat Bank,[9] but granted limited expedited discovery from HSBC. (Dkt. No. 49) The parties were then permitted to file additional submissions at the end of the discovery period.

---

[8] At the July 27, 2016 hearing, HSBC expressed concern that it would have to pay interest on the amount due under the Amended HSBC Letter of Credit in the event that the Court granted 3M's application for a temporary restraining order but it was later determined that HSBC was obligated to make payment on the Amended HSBC Letter of Credit. (Aug. 17, 2016 Tr. (Dkt. No. 12) at 6) This Court invited HSBC to apply for the posting of security that would address this concern (id. at 9), but HSBC submitted no such application.

[9] The Court denied 3M's request for expedited discovery from Ziraat Bank based on concerns that Ziraat Bank – as an instrumentality of the Turkish state – is entitled to the protections of the Foreign Sovereign Immunities Act. (Dkt. No. 49 at 3)

11

## I.    LEGAL STANDARD

"[A] district court must undertake [a four-step] inquiry in determining whether to grant a plaintiff's motion for a preliminary injunction. . . ." Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010). "First, . . . a court may issue a preliminary injunction . . . only if the plaintiff has demonstrated 'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor.'" Id. (quoting NXIVM Corp. v. Ross Inst., 364 F.3d 471, 476 (2d Cir. 2004)). "Second, the court may issue the injunction only if the plaintiff has demonstrated 'that he is likely to suffer irreparable injury in the absence of an injunction.'" Id. at 79-80 (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). "Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." Id. at 80. "Finally, the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." Id. (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

## II.    ANALYSIS

### A.    Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faively Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent

12

injunction." Salinger, 607 F.3d at 81 (internal citation omitted). "The court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm. . . . Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" Id. at 80 (quoting eBay Inc., 547 U.S. at 391).

"As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm." Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999) (citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)). "However, a perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." Id. at 249-50 (citing American Hosp. Supply Corp. v. Hospital Prods. Ltd., 780 F.2d 589, 594 (7th Cir. 1986)).

Here, 3M has demonstrated that it will likely suffer irreparable harm if the preliminary injunction is not granted. To the extent 3M seeks to pursue its claims against Vendeka, those claims are unlikely to succeed due to Vendeka's financial condition. "[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents," Brenntag Int'l Chemicals, Inc., 175 F.3d at 250, and here Vendeka's creditors have frozen its bank accounts and claimed its assets, including the $1 million at issue. (See Kaufman Reply Decl. (Dkt. No. 24) ¶ 3(h); see also Kardicali Decl. (Dkt. No. 25) ¶ 3) Accordingly, in the event that HSBC releases the $1 million that is the subject of the HSBC Letter of Credit, it appears unlikely that 3M could recover these funds from Vendeka.

It also appears unlikely that 3M could recover the $1 million from PTT and Ziraat Bank. PTT and Ziraat Bank are instrumentalities of the Turkish state. An action against either entity in the United States is likely barred by the Foreign Sovereign Immunities Act ("FSIA"). See Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 74-82 (2d Cir. 2010) (dismissing claim against Ziraat Bank under FSIA for lack of subject matter jurisdiction, where claim related to an alleged unauthorized withdrawal from a joint bank account in Turkey). 3M further argues that political uncertainty following a failed coup attempt in Turkey in July 2016 limits the availability of judicial relief in Turkey. (Pltf. Br. (Dkt. No. 28) at 11-12) Political upheaval may support a showing of irreparable harm. See Rockwell Int'l Systems v. Citibank, N.A., 719 F.2d 583, 586-88 (2d Cir. 1983) (upholding injunction prohibiting payment on two letters of credit in light of Iranian revolution and its effect on the availability of judicial remedies). Political turmoil in Turkey continues, along with animosity between the governments of Turkey and the United States. See, e.g., Turkey's Purges are Crippling Its Justice System, the Economist (May 20, 2017), https://www.economist.com/news/europe/21722200-president-erdogans-drive-power-includes-putting-judges-under-his-thumb-turkeys-purges-are; Tom Embury-Dennis, Turkey's Erdogan Threatens to Cut Ties with US over Jailing of Banker, The Independent (Jan. 5, 2018), https://www.independent.co.uk/news/world/europe/turkey-erdogan-us-justice-world-doomed-corruption-banker-case-trump-a8143586.html; Erin Cunningham, Thousands of Judges Purged in Turkey after Failed Coup Attempt, The Washington Post (July 21, 2016), https://www.washingtonpost.com/world/turkeys-suspension-of-thousands-of-judges-marked-the-start-of-a-widespread-purge/2016/07/20/dbf79e18-4c50-11e6-bf27-405106836f96_story.html?noredirect=on&utm_term=.30d0da8bb635. Accordingly, it is

uncertain whether any judicial remedy would be available to 3M in Turkey, particularly as against instrumentalities of the Turkish state.[10]

The Court concludes that 3M has demonstrated at least a "substantial chance" that it "cannot be returned to the position[] [it] previously occupied" if a preliminary injunction is denied. See Brenntag Int'l Chemicals, Inc., 175 F.3d at 249. Accordingly, 3M has made an adequate showing of irreparable injury in the absence of a preliminary injunction.

## B.    Likelihood of Success on the Merits

To obtain a preliminary injunction, 3M also must demonstrate a likelihood of success on the merits. See Salinger, 607 F.3d at 79. 3M argues that this Court should enjoin payment on the HSBC Letter of Credit due to fraud in the transaction. (Pltf. Br. (Dkt. No. 28) at 9-11)

### 1.    Applicable Law

#### a.    Letters of Credit

"Letters of credit are commercial instruments that provide a [beneficiary] with a guaranteed means of payment from a creditworthy third party (the issuer) in lieu of relying solely on the financial status of [the applicant]." Nissho Iwai Europe v. Korea First Bank, 99 N.Y.2d 115, 119 (2002). "Three distinct contractual relationships are usually present when a letter of credit is issued": (1) "the underlying agreement between the applicant . . . and the beneficiary"; (2) the "contractual obligation . . . between the issuer . . . and its applicant . . . regarding the

---

[10] In an October 20, 2017 letter, 3M requests leave to file a supplemental declaration to update the Court regarding (1) Turkey's "essentially nationalizing the assets of Posta ve Telgraf Teskilati ('PTT') and Ziraat Bankasi ('Ziraat')"; and (2) the "disarray in the justice system in Turkey." (Dkt. No. 71) Because the Court finds that PTT and Ziraat Bank are instrumentalities of the Turkish state, and that the availability of a judicial remedy in Turkey is uncertain, 3M's request is denied as moot.

terms of the letter of credit and the extent of funds to be made available"; and (3) the contractual obligation between the issuer and the beneficiary – that is, the letter of credit itself – which embodies "the issuer's commitment to 'honor drafts or other demands for payment presented by the beneficiary . . . upon compliance with the terms and conditions specified in the credit.'" Id. at 120 (citing First Commercial Bank v. Gotham Originals, 64 N.Y.2d 287, 294 (1985)).

"'The great utility of the letter of credit derives from the fact that these three relationships are utterly independent of one another.'" Great Wall De Venezuela C.A. v. Interaudi Bank, 117 F. Supp. 3d 474, 484 (S.D.N.Y. 2015) (quoting Alaska Textile Co. v. Chase Manhattan Bank, N.A., 982 F.2d 813, 815 (2d Cir. 1992)). "'[T]he issuing bank's obligation to honor drafts drawn on a letter of credit by the beneficiary is separate and independent from any obligation of its customer to the beneficiary under the sale of goods contract and separate as well from any obligation of the issuer to its customer under their agreement.'" 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 741 (2d Cir. 1999) (quoting First Commercial Bank, 64 N.Y.2d at 294); see also Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., 707 F.2d 680, 682 (2d Cir. 1983) (issuing bank's obligation to the beneficiary "is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction").

"This independence principle is predicated upon the fundamental policy that a letter of credit would lose its commercial vitality if before honoring drafts the issuer could look beyond the terms of the credit to the underlying contractual controversy or performance between its customer and the beneficiary." Twp. of Burlington v. Apple Bank for Sav., No. 94 Civ. 6116 (JFK), 1995 WL 384442, at *5 (S.D.N.Y. 1995) (citing KMW Int'l v. Chase Manhattan Bank, N.A., 606 F.2d 10, 16 (2d Cir. 1979)). "If the documents [] comply with the terms of the credit,

the issuer's duty to pay is absolute," regardless of what occurs in the related transaction. Alaska Textile Co. Inc., 982 F.2d at 816.

The "independence principle" is embodied in Article 5 of the New York Uniform Commercial Code. See N.Y. U.C.C. Law § 5-103(d) ("Rights and obligations of an issuer to a beneficiary . . . under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.").

In sum, "when the beneficiary of a letter of credit makes a demand that conforms to the terms of that letter, the issuing bank must pay the amount due." Great Wall De Venezuela C.A., 117 F. Supp. 3d at 485. This duty to pay is absolute, and "[t]he issuing bank may not refuse payment for reasons related to its contract with the applicant or the underlying contract between the beneficiary and the applicant." Id.

### b. **The Fraud Exception**

"Fraud provides a well-established exception to the rule that banks must pay a beneficiary under a letter of credit when documents conforming on their face to the terms of the letter of credit are presented." Semetex Corp. v. UBAF Arab Am. Bank, 853 F. Supp. 759, 773 (S.D.N.Y. 1994) (citations omitted). The HSBC Letter of Credit at issue here is governed by ISP98 and, for matters not addressed by ISP98, by New York law. (See Kaufman Decl., Ex. C (HSBC Letter of Credit) (Dkt. No. 29-3) at 3) While ISP98 makes no provision for a fraud exception, see ISP98 § 1.05(c), such an exception has been codified under the New York Uniform Commercial Code.

Section 5-109(a) of the Code provides:

17

> If a presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit, but a required document is forged or materially fraudulent, or honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant[,] . . . [t]he issuer, acting in good faith, may honor or dishonor the presentation . . . .

N.Y. U.C.C. Law § 5-109(a)(2).

The fraud exception is limited in scope. "[B]ecause the smooth operation of international commerce requires that requests for payment under letters of credit not be routinely obstructed by pre-payment litigation, the fraud exception to the independence principle 'is a narrow one' that is only available on a showing of 'intentional fraud.'" BasicNet S.p.A. v. CFP Servs. Ltd., 127 A.D.3d 157, 171 (1st Dep't 2015) (quoting All Serv. Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A., 921 F.2d 32, 35 (2d Cir. 1990)); see also Semetex Corp., 853 F. Supp. at 773. Indeed, "[i]nquiry into collateral contracts under the doctrine of fraud in the transaction would eviscerate the commercial utility of the letter of credit by increasing the potential for litigation and judicial interference." Banque Worms, New York Branch v. Banque Commerciale Privee, 679 F. Supp. 1173, 1182 (S.D.N.Y. 1988).

Commentary to the New York Uniform Commercial Code explains that, in order for the fraud exception to apply, the following conditions must be met: (1) "fraud must be found either in the documents or must have been committed by the beneficiary on the issuer or applicant"; and (2) the "fraud must be 'material.'" N.Y. U.C.C. § 5-109, Official Comment 1. Moreover, "[m]aterial fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor." Id. The commentary further explains that a court "may enjoin payment" on a letter of credit on the basis of "material fraud" "'[w]here the circumstances "plainly" show that the underlying contract forbids the beneficiary to call a letter of credit'"; "'where they show that the contract deprives the beneficiary of even a "colorable" right to do so'"; "'where the contract and circumstances

18

reveal that the beneficiary's demand for payment has "absolutely no basis in fact""'"; or "'where the beneficiary's conduct has "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served.""'" N.Y. U.C.C. § 5-109, Official Comment 1 (quoting Ground Air Transfer, Inc. v. Westate's Airlines, Inc., 899 F.2d 1269, 1272-73 (1st Cir. 1990)) (internal citations omitted) (emphasis in Ground Air Transfer).

The Second Circuit has reiterated that the fraud defense "authorizes dishonor only where 'a drawdown would amount to an outright fraudulent practice by the beneficiary.'" 3Com Corp., 171 F.3d at 747 (quoting Recon/Optical, Inc. v. Government of Israel, 816 F.2d 854, 858 (2d Cir. 1987)). "[C]ourts have found such 'outright fraudulent practice' only rarely," however. Semetex Corp., 853 F. Supp. at 774.

Where, as here, a bank has issued a "clean" letter of credit – that is, "one calling only for a draft and no other documents" – the commentary to the New York Uniform Commercial Code cautions that courts should be particularly "skeptical" of fraud claims. See N.Y. U.C.C. § 5-109, Official Comment 3 ("The courts should be skeptical of claims of fraud by one who has signed a 'suicide' or clean credit and thus granted a beneficiary the right to draw by mere presentation of a draft.").

## 2. Analysis

In support of its motion for a preliminary injunction, 3M argues that Ziraat Bank has committed fraud or, alternatively, PTT as the ultimate beneficiary has committed fraud that may be imputed to Ziraat Bank. (Pltf. Reply Br. (Dkt. No. 23) at 11-13)

### a. Fraud by Ziraat Bank

As discussed above, the commentary to the New York Uniform Commercial Code makes clear that – in order for the fraud exception to apply – "fraud must be found either in the

documents or must have been committed by the beneficiary on the issuer or applicant." N.Y. U.C.C. § 5-109, Official Comment 1. A "beneficiary" is defined as "a person who under the terms of a letter of credit is entitled to have its complying presentation honored." N.Y. U.C.C. Law § 5-102(a)(3). Here, the parties agree that Ziraat Bank is the beneficiary on the Amended HSBC Letter of Credit. (See Def. Opp. Br. (Dkt. No. 7) at 3; Pltf. Reply Br. (Dkt. No. 23) at 11) Accordingly, this Court must determine whether 3M has demonstrated a likelihood of success on its claim that Ziraat Bank's demand was fraudulent.

As an initial matter, 3M does not contend that Ziraat Bank knew that the HSBC Letter of Credit – either in its original or amended form – was fraudulent ab initio. While Ziraat Bank requested that the original conditions premised on Section 4.2 of the Service Agreement be deleted – representing that Aktif Bank had requested this change – there is no evidence that Ziraat Bank knew or should have known that this requested change was part of an effort to defraud 3M.

Moreover, as beneficiary under the Amended HSBC Letter of Credit, Ziraat Bank was entitled to payment from HSBC after submitting "written demand via authenticated SWIFT . . . supported by [a] written statement certifying that [Ziraat Bank had] received a demand for . . . payment" on the standby letter of credit it had issued in favor of Aktif Bank, as long as Aktif Bank's demand was "in accordance with [the] terms [of the letter of credit Ziraat Bank had issued in favor of Aktif Bank]." (Arber Decl., Ex. B (Amendment to HSBC Letter of Credit) (Dkt. No. 8-2) at 2)

On July 18, 2016, Ziraat Bank sent a SWIFT message to HSBC requesting that its account be credited in the amount of $1 million, stating that it had "received a valid demand for payment for USD 1,000,000[] from Aktif Yatirm Bankasi under our stan[d]by letter of credit in

20

accordance with its terms." (Arber Decl., Ex. E (Demand for Payment) (Dkt. No. 8-5)) This request facially conforms to the Amended HSBC Letter of Credit's drawing conditions.[11]

3M argues, however, that Ziraat Bank's refusal to provide documentation of Aktif Bank's demand "is circumstantial evidence of fraud." (Supp. Kaufman Decl. (Dkt. No. 56) ¶¶ 9-11) 3M does not appear to dispute that Ziraat Bank received a demand on the letter of credit it had issued in favor of Aktif Bank, however. Instead, 3M argues that Ziraat Bank has "refused to provide to HSBC the documentation for its letter of credit in favor of Aktif Bank or the documentation of Aktif Bank's demand for payment to Ziraat Bank, all of which ha[s] been requested by 3M from HSBC." (Kaufman Reply Decl. (Dkt. No. 24) ¶ 3(k); see also Kaufman Supp. Decl. (Dkt. No. 56) ¶ 9)

The Amended HSBC Letter of Credit does not require Ziraat Bank to provide these documents in order to draw on the letter of credit, however.[12] To the contrary, the Amended HSBC Letter of Credit is a "clean" letter of credit that requires only a demand and a "written statement [from Ziraat Bank] certifying that [Ziraat Bank] ha[s] received a demand for payment under [the letter of credit Ziraat Bank issued in favor of Aktif Bank] in accordance with

---

[11] HSBC initially marked Ziraat Bank's draw as "discrepant," but later changed that determination to "clean." (Supp. Kaufman Decl. (Dkt. No. 56) ¶ 19) HSBC explains that the "discrepant" notation was made by an HSBC employee who compared the demand to the original October 30, 2012 version of the HSBC Letter of Credit, which contained the conditions premised on Section 4.2 of the Service Agreement. (Yiu Decl. (Dkt. No. 61) ¶¶ 4-5) When HSBC compared the draw to the amended HSBC Letter of Credit, it determined that Ziraat Bank had made a conforming draw. (Id. ¶ 5)

[12] 3M asserts that HSBC did not conduct an "adequate investigation" into the validity of Ziraat Bank's demand, and complains that "[t]he only investigation by HSBC . . . was to review Ziraat's demand set forth in a SWIFT message and to review the letter of credit." (Supp. Kaufman Decl. (Dkt. No. 56) ¶¶ 13-21) 3M has not shown that HSBC had a legal duty to conduct any further investigation, however. Indeed, the Amended HSBC Letter of Credit required only a written demand accompanied by a written certification stating that Ziraat Bank had received a conforming demand on its letter of credit from Aktif Bank. (See Arber Decl., Ex. B (Amendment to HSBC Letter of Credit) (Dkt. No. 8-2) at 2)

21

[that letter of credit's] terms." (Arber Decl., Ex. B (Amendment to HSBC Letter of Credit) (Dkt. No. 8-2) at 2); see also N.Y. U.C.C. § 5-109, Official Comment 3. HSBC determined that Ziraat Bank's demand conformed to the requirements of the Amended HSBC Letter of Credit, and under the independence principle, had an obligation to make payment. See Voest-Alpine Int'l Corp., 707 F.2d at 682 (bank's obligation to the beneficiary "is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction").[13]

The Court concludes that 3M has not demonstrated a likelihood of success on its claim that Ziraat Bank engaged in fraud in connection with the Amended HSBC Letter of Credit.

### b. Fraud Imputed to Ziraat Bank

3M contends that fraud committed by PTT is sufficient to justify injunctive relief. (Pltf. Reply Br. (Dkt. No. 23) at 8-13) 3M argues that where, as here, there are back-to-back letters of credit, and where "an intermediary bank beneficiary and an ultimate beneficiary [] are both part of the same government," fraud by the ultimate beneficiary can be imputed to the intermediary bank beneficiary. (Id. at 8, 11 (citing Itek Corp. v. First Nat'l Bank of Boston, 730 F.2d 19 (1st Cir. 1984); Touche Ross & Co. v. Manufacturers Hanover Trust Co., 107 Misc. 2d 438 (Sup. Ct. N.Y. Cnty. 1980), aff'd, 86 A.D.2d 990 (1st Dep't 1982)).

According to 3M, PTT fraudulently drew on Aktif Bank's letter of credit long after Vendeka had (1) ceased working on the HGS Project; and (2) performed the obligations meant to be secured by the Aktif Bank letter of credit. (Pltf. Reply Br. (Dkt. No. 23) at 11-12) In support of these allegations, 3M has submitted, inter alia, a declaration showing that a 3M

---

[13] While 3M argues that the amendment removing the reference to Section 4.2 of the Service Agreement was made at the request of Ziraat Bank and worked to its advantage (see Supp. Kaufman Decl. (Dkt. No. 56) ¶¶ 2, 6), this does not demonstrate fraud, particularly given that 3M reviewed and approved the changes to the HSBC Letter of Credit requested by Ziraat Bank. (See Arber Decl., Ex. C (3M Consent) (Dkt. No. 8-3))

22

employee was told by a PTT representative on August 6, 2016, that PTT "did not have a basis" to draw on the Aktif Bank letter of credit and that the $1 million should be returned to Aktif Bank. (Kurklu Decl. (Dkt. No. 27) ¶¶ 1, 3)

3M's own submissions present a plausible, non-fraudulent explanation for PTT's draw, however. Pursuant to its contract with PTT, Vendeka agreed to post a performance guarantee in favor of PTT. (Driessen Decl., Ex. 1, App. C (Draft Agreement between Vendeka and PTT) (Dkt. No. 29-6) at 25) Section 11.3.1 of the Vendeka-PTT contract provides that Vendeka will be entitled to the return of the performance bond "[u]pon the fulfillment of the contract in accordance with the provisions of the Agreement and tender documents, [and after] determining that [Vendeka] has no debts against the Administration . . . and [has] obtain[ed] [a] clearance certificate from [the] Social Security Institution." (Id.)

In a June 22, 2016 letter to Vendeka, PTT explains that, under Turkish law,

[i]n order to ensure the consummation of transactions without allowing performance bonds to expire because of delayed issuance of "no social security tax debt" statements by the Social Security Institution, the contractor's failure to submit a "no lien affidavit" obtained from the Social Security Institution . . . will result in the cashing of the performance bonds and [] credit[ing] . . . the contractor's debts and the return of the remainder, if any, back to the contractor. . . .

(Kaufman Reply Decl., Ex. C (June 22, 2016 PTT Ltr.) (Dkt. No. 24-3) at 9) Because of the length of time required to obtain a "no lien affidavit," PTT asks Vendeka – in the same letter – to obtain an extension on the Aktif Bank letter of credit to avoid a drawdown. (Id.) PTT subsequently justified its July 18, 2016 drawdown on the Aktif Bank letter of credit based on the fact that Vendeka had "declin[ed] [PTT's] request for [a] time extension of the guarantee letter." (Kardicali Decl., Ex. A (Dkt. No. 25-1) at 6-7) And – in accordance with the representations set forth in its June 22, 2016 letter – PTT returned the proceeds of the performance guarantee to Vendeka by wire transfer from Ziraat Bank on August 5, 2016. (Kaufman Reply Decl. (Dkt. No.

24) ¶ 3(h), 3(l))  3M has not responded to HSBC's argument on this point, which was raised both at the preliminary injunction hearing (Sept. 8, 2016 Hearing Tr. (Dkt. No. 40) at 21-24), and in a subsequent submission. (Def. Supp. Opp. (Dkt. No. 45) at 7-11)

3M's agreement to Ziraat Bank's proposed amendment to the HSBC Letter of Credit – which removed the reference to Section 4.2 of the Service Agreement – left it vulnerable, because the letter of credit it was providing was no longer tethered to its own performance. Under the Service Agreement with Vendeka, 3M was only obligated to post a letter of credit in favor of Vendeka to guarantee 3M's performance as subcontractor. (Driessen Decl., Ex. 1 (Service Agreement) (Dkt. No. 29-6) at 7)  But by consenting to the amendment of the HSBC Letter of Credit, 3M permitted the reference to these drawing conditions – tied to 3M's own performance in connection with the HGS Project – to be eliminated.  3M thereby left itself unprotected with respect to a drawdown by PTT on the Aktif Bank letter of credit, which in turn provoked Ziraat Bank's drawdown on the Amended HSBC Letter of Credit.

The Court concludes that 3M has not demonstrated a likelihood of success on its claim that PTT's draw on the Aktif Bank letter of credit was fraudulent.  Material fraud under the New York Uniform Commercial Code exists where a beneficiary has "absolutely no basis in fact" to demand payment or where the circumstances "'plainly' show that the underlying contract forbids the beneficiary to call a letter of credit."  See N.Y. U.C.C. § 5-109, Official Comment 1.  As discussed above, a basis in fact exists which 3M has not addressed, much less rebutted.  Moreover, neither PTT nor Ziraat Bank kept the $1 million drawn on the Aktif Bank letter of credit.  Under these circumstances, this Court is not persuaded that any fraud by PTT in drawing down on the Aktif Bank letter of credit can be imputed to Ziraat Bank.

*       *       *       *

24

Because 3M has not shown a likelihood of success on its claims of fraud, its application for a preliminary injunction must be denied. See Alaska Textile Co. Inc., 982 F.2d at 816 (in the absence of fraud, "[i]f the documents [] comply with the terms of the credit, the issuer's duty to pay [on a letter of credit] is absolute").

## CONCLUSION

For the reasons stated above, 3M's application for a preliminary injunction is denied, and the temporary restraining order previously issued by this Court (Dkt. Nos. 3, 35) is vacated. The Clerk of Court is directed to terminate 3M's October 20, 2017 letter motion as moot. (Dkt. No. 71)

Dated: New York, New York
April 25, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

25